Henry Lewis, and others, trading as Lewis, Brothers & Co. *vs.* Otto Brehme.

*Liability of a Del credere agent—Liability of an Agent upon his Endorsement, as between himself and his Principal—Demand and Notice—Defective prayer —Promise by an Endorser to pay a Dishonored draft, Presumptive evidence of Demand and notice.*

An agent who undertakes to procure a particular person to deal with his principal, and in consideration of an additonal commission allowed him, guarantees the payment of all bills of goods purchased of his principal by such customer, is a *del credere* agent, and as such is primarily liable to satisfy his principal the price of the goods sold.

A factor acting under a *del credere* commission, collected the proceeds of a bill of goods sold by his principal to a particular customer, and placed the money to his own account with his bankers, and purchased of them a gold draft payable to his own order, which he specially endorsed, without excluding recourse, and transmitted to his principal. The draft included not only the money collected by the agent, but also a balance due from himself to his principal. The draft was afterwards dishonored. Prior to the presentation of the draft for payment, the drawers thereof failed. In an action by the principal against the agent to recover the amount of the draft, Held:

1st. That the agent was bound not only for the collection of the money, but for its safe transmission to his principal.

2d. That the endorsement by the agent imported *prima facie* liability on his part, but he was entitled to show as a matter of defence that it was not the intention that he should be personally charged by his endorsement, and if there were no intention to create personal liability, none would exist as between himself and his principal.

3d. That whether such intention exists or not, will in all cases depend upon the circumstances of the transaction, but the circumstances must be clear and strong to remove the presumption which arises from the endorsement.

A *del credere* agent for the purpose of remitting certain moneys which he had received belonging to his principal, as also moneys due by himself, purchased a gold draft payable to his own order, which he specially endorsed and transmitted to his principal. The draft was dishonored and

returned to the agent, who retained it and made efforts to procure its payment to himself, and failing in this, procured the drawers of the draft to secure him among their first preferred creditors in a deed of trust. The agent notified his principal of these proceedings. After the dishonor and return of the draft, the agent treated the loss thereon as his own and promised his principal to send him another draft. In an action by the principal to charge the agent as endorser on the draft, HELD:

That the promise or undertaking by the agent to pay the debt, was not sufficient to bind him as endorser, unless at the time of such promise or undertaking, he was fully informed that there had not been due demand, and notice of dishonor. And a prayer which did not submit to the jury to find whether the agent was fully informed, at the time of such promise or undertaking, of all the facts and circumstances of the neglect to make demand and to give notice, was defective.

A promise by an endorser to pay a draft, subsequent to its dishonor, is presumptive evidence that the draft had been presented for payment in due time and dishonored, and that he had received due notice thereof. This presumption however is one of fact for the jury, and not an absolute legal conclusion to be drawn by the Court. It is *prima facie* only and liable to be rebutted.

APPEAL from the Superior Court of Baltimore City.

This suit was instituted by the appellants against the appellee; the declaration contained the common counts—a count for $2,283.30 in gold coin, received by the defendant for the use of the plaintiffs, and a count upon a gold check for said sum.

Evidence was offered to support the hypothesis of the prayers.

*Exception:* The plaintiffs offered the following prayers:

1st. If the jury shall find from the evidence that the defendant, as the factor of the plaintiffs, had agreed, for a commission, to guarantee the purchases of Edwin Akers from the plaintiffs, payable in gold or its equivalent; and that he received from said Akers, on or about the 25th April, 1866, currency equivalent to the amount of Aker's debt to the plaintiffs in gold, for the purpose of remitting the same to the plaintiffs in Philadelphia; and that the defendant, on the 27th April, 1866, procured from Bayne & Co., in Baltimore, a gold draft for the amount due the plaintiffs by said Akers,

adding thereto a further sum due by the defendant himself to the plaintiffs in gold, upon Hoyt, Anthony, Douglas & Co., in New York, payable in that city on the 30th April, 1866, and procured the same to be drawn to his own order, (by the name of O. Brehme & Co.,) and endorsed the same specially to the plaintiffs, by the name of O. Brehme & Co., in manner and form as appears by said draft offered in evidence, and transmitted the same to the plaintiffs in Philadelphia, who received the same the next day, 28th April, and endorsed it and sent it the same day to New York for collection; and that said draft was presented, on the 30th of April, to Anthony, Hoyt, Douglas & Co., in New York, for payment, and was dishonored, and that on the next day the plaintiffs received notice by telegram of the dishonor of said draft, and on the same day sent notice to the defendant, by telegram, of the dishonor and non-payment of said draft, and that the defendant thereupon made efforts to procure payment of said draft from Bayne & Co., the drawers, and failing in that, procured himself to be secured as a preferred creditor, in his own business name of O. Brehme & Co., for the sum of $3,000, in an assignment executed by Bayne & Co., on the 5th May, 1866, for the benefit of their creditors, and that neither the defendant nor any other person has since paid to the plaintiffs any part of said draft, then the plaintiffs are entitled to recover the amount of said draft and interest from the defendant in gold.

2d. If the jury shall find from the evidence that the defendant, for the purpose of remitting to the plaintiffs moneys in his hands, received and belonging to the plaintiffs, and also moneys due by the defendant himself, on his own account, to the plaintiffs, purchased and forwarded to them the gold draft offered in evidence, and that said draft was dishonored and returned to the defendant; and shall further find that on the return of said draft, the defendant retained the same, and made efforts to procure payment of said draft to himself, and failing in that, procured the drawers, Bayne & Co., to secure

him among their first preferred creditors (in his own business name of O. Brehme & Co.) for the amount of said draft, and that he notified the plaintiffs of the proceedings on his part, and in his correspondence with them during the year 1866, after the dishonor and return of said draft, treated the loss as his own, and promised the plaintiffs to send them another draft; and shall further find that the plaintiffs, by reason of such proceedings and assurances on the part of the defendant, treated the loss on said draft, and the duty of collecting and securing it as that of the defendant, and not as their own, and that the defendant did not, until some time in the year 1867, distinctly make known to the plaintiffs that he did not consider himself responsible to make good to them the amount of said draft, then the plaintiffs are entitled to recover the amount of said draft and interest in gold, notwithstanding they may find from the evidence that the defendant was acting only as the agent of the plaintiffs in remitting the moneys received by him on their account, and that, for the purpose of making such remittance, he purchased said draft in good faith, and without any knowledge of the insolvency or discredit of the house of Bayne & Company.

3d. If the jury shall find from the evidence that the defendant, as the plaintiffs' agent, on or about the 25th April, 1866, received from Edwin Akers a sum of money in currency, to be remitted to the plaintiffs in Philadelphia, or its equivalent in gold coin, and that for the purpose of making such remittance on the 27th of April, 1866, (being Friday,) the defendant bought from Bayne & Co., bankers, in Baltimore, the gold draft on New York, offered in evidence, with the understanding that it was not to be presented for payment in New York until the succeeding Monday, 30th of April, and transmitted the same to the plaintiffs, who caused the same to be presented on the 30th of April for payment, and that the same was dishonored, and had never since been paid to the plaintiffs; and· shall further find that at the time of the purchase of said draft, the said banking house of Bayne

& Co. had failed to meet their obligations, and were discredited, and that the defendant, by the exercise of reasonable diligence, might have ascertained the fact of such discredit, then the plaintiffs are entitled to recover from the defendant the amount of said draft and interest in gold.

The defendant prayed the Court to instruct the jury as follows:

1st. If the jury shall believe from the evidence that the plaintiffs were merchants, residing in Philadelphia, and the defendant a merchant residing in Baltimore, at the time of the transactions hereinafter stated, and that the plaintiffs verbally agreed with the defendant in consideration, that the defendant would induce Edwin Akers to buy goods from them, that they would give said defendant a commission on all goods that said Akers might purchase from them, whether such purchases should be made directly from the plaintiffs in Philadelphia, or should be made from the defendant in Baltimore; and that said plaintiffs further agreed in consideration, that the defendant would guaranty the payment of all purchases made by said Akers, whether directly from the plaintiffs or through the defendant, they would pay the defendant a further commission; and if they shall further find that the plaintiffs also agreed with said Akers, that he might pay for all goods bought by him, either by direct payment to said plaintiffs, or by payment to the defendant; and if they shall further find that after said agreements the said Akers sometimes bought goods directly from the plaintiffs and sometimes through the defendant, and that said Akers sometimes paid directly to the plaintiffs and sometimes to the defendant for them, and that upon all such purchases said defendant received a commission; and if they shall further find that the goods, the price of which is in controversy in this case, were sold by the plaintiffs directly to Akers and forwarded to him, without the intervention in any way of the defendant; and that before the maturity of the bill for said goods the plaintiffs sent the

same to the defendant with the request that he would collect and remit the same, and that the said Akers in fact paid the amount of his bill to the defendant, then such payment by said Akers to the defendant discharged the obligations of the defendant to the plaintiffs under said contract of guaranty.

2d. If the jury shall find the facts stated in the defendant's first prayer, and if they shall further find that after the defendant had received the money from Akers, the said defendant, on the 27th of April, 1866, purchased from Bayne & Co., the draft offered in evidence, and remitted the same to the plaintiffs on the same day, without any additional compensation from plaintiffs, besides the consideration. mentioned in the first prayer; and if they shall further find that the form of said draft, and the mode of remittance adopted by the defendant in this instance, was the same that he had been accustomed to use in sending money to the plaintiffs under like circumstances; and if they shall further find that the defendant, in the purchase of said draft in view of all the circumstances of the case, acted with ordinary care and caution, and in good faith, and without knowledge of any thing to affect the credit of the drawers of said draft, or without knowledge of any kind, which would induce a man of ordinary prudence to suspect the solvency or entire responsibility and credit of the drawers, then the plaintiffs are not entitled to recover so much of the money sued for in this case as the jury may find to have been received by the defendant from said Akers.

The Court rejected the prayers of the plaintiffs and granted those of the defendant; the plaintiffs excepted.

The verdict was for the plaintiffs for $75.27 in gold coin, which sum not being within the Court's jurisdiction, judgment of *non pros* was entered. The plaintiffs appealed.

The cause was argued before BARTOL, C. J., BRENT, ALVEY and ROBINSON, J.

*William F. Frick,* for the appellants.

The defendant's first prayer was erroneous—

1st. Because it ignored the evidence of a special contract of the defendant to be bound to collect and remit, *as if the debt was his own.*

2d. Because, even if the defendant were treated as an ordinary *del credere* factor, without reference to his special contract, the obligation rested upon him to pay Akers' debt, as his own, and therefore to remit, by money or a *good* check or draft. This presents, what is believed to be, an open question in Maryland.

Under the early law, this guaranty was held to involve an absolute and not a conditional responsibility for the debt. The guarantor was substituted for the purchaser, and, therefore, of course, bound to *remit safely* the debt if collected. *Grove vs. Dubois,* 1 *Term Rep.,* 112; *Livermore on Agents and Factors,* 409, 410, 411; *Mackenzie vs. Scott,* 6 *Brown's Parl. Cases,* 280; *Paley on Principal and Agent,* 28 *Law Library,* 41, (*margin.*)

The doctrine was first questioned by Judge STORY, in *Thompson vs. Perkins,* 3 *Mason,* 237, and afterwards in *Story on Agency,* sec. 215.

In England also, in the two cases of *Gall vs. Comber* and *Peele vs. Northcote, in* 7 *Taunton,* followed by *Morris vs. Cleasby, in* 4 *Maule & Selwyn,* which determined the guarantee to be a *collateral* and not an original undertaking, and therefore not good under the Statute, *unless in writing.* — Hence KENT treats it as late as 1851, as an open question. 2 *Kent's Comm.,* 799, (*margin* 625.)

In the later cases there is much conflict and uncertainty, but a marked tendency to return to the early doctrine of Lord MANSFIELD. *Swan vs. Nesmith,* 7 *Pickering,* 224; *Wolf vs. Koppel,* 5 *Hill,* 460 *and* 2 *Denio,* 371; *Couturier vs. Hastie,* 16 *Eng. L. & E. Rep.,* 571; *Sherwood vs. Stone,* 14 *N. Y.,* 267.

The prayer concedes that the guaranty was binding, though it assumes it to be only *verbal,* and yet it deals with it as if it were purely a *collateral* undertaking.

The plaintiffs' first prayer is based upon the theory, 1st. That the defendant was bound, under his contract of guaranty, to remit safely his collection of the guaranteed debt. 2d. That even if this were not clearly so, inasmuch as he chose to mix up money, confessedly due by himself, with money collected from Akers, and to remit *the sum total* by means of a draft, which he bought and made payable to himself, and endorsed specially to the plaintiffs, and furthermore, upon receiving notice of the dishonor of said draft, took upon himself to require security from the insolvent drawers, in his own name, *as one of their preferred creditors,* he must be treated as having made himself personally responsible to the plaintiffs for the *whole* amount intended to be paid by the draft, by reason of the character of the remittance, and the form of the draft, and the nature of his dealings with the drawers. *Story on Agency,* sec. 269; *Lefevre vs. Lloyd,* 5 *Taunton,* 749; *Goupy vs. Harden,* 7 *Taunton,* 159; *Heuback vs. Mollman,* 2 *Duer,* 260.

The plaintiffs' second prayer, proceeded upon the theory that the defendant, (without reference to the legal effect of his contract of guaranty,) had made himself *personally* responsible for the whole debt he intended to remit, not only by reason of the character and form of his remittance, and his assumption of the responsibility of securing it to himself in his own name, but also, by reason of *his express promise* to pay the debt, by sending another draft in place of the dishonored one, returned to and *retained by him,* for the purpose of securing himself against the drawers; and also, by reason of the effect of that promise upon the plaintiffs, who were thereby deceived and lulled into the belief that they were not to look to Bayne & Co., but were to treat the loss as that of the defendant, and not as theirs, and therefore to

forbear proceedings on their part against Bayne & Co., and to give time and indulgence, as requested, to the defendant. This proposition the Court below erroneously supposed to be untenable for want of a sufficient consideration to support the admitted promise. *Story on Agency*, sec. 269, *et seq.*

The defendant's second prayer ignored all the facts and circumstances set forth in the plaintiffs' first and second prayers, and treated the mere remittance of the dishonored draft as a complete acquittance of the defendant from all further responsibility on account of the moneys received from Akers, without reference to the question whether the draft was intended or accepted *as payment.* It ignored, also, other facts in the case, and among them the fact not noticed in the plaintiffs' prayers, that the defendant mixed up the money received from Akers with his own, and deposited it, at different times, and in several amounts, to his own individual credit, in the banking house of Bayne & Co., with whom he kept an account.

By this mode of dealing with it, he assumed a responsibility for the solvency of Bayne & Co.; and if so, the defendant's second prayer, ignoring this state of facts, ought not to have been granted. *Story on Agency*, sec. 208.

The plaintiffs' third prayer was intended to present the question of the defendant's responsibility, under any circumstances, to make the draft good, inasmuch as it had been confessedly bought of a broken and discredited banking firm, if, *by the exercise of reasonable diligence,* he might have ascertained the fact of such discredit.

The Court refused to put the instruction in that form, and adopted the defendant's view, (contained in his second prayer,) that he was absolved from responsibility if he acted with ordinary care, &c., or (in the alternative) *"without knowledge* of any kind, which would induce a man of ordinary prudence to *suspect* Bayne & Co.'s solvency."

If the jury should have found the fact, that when the draft was bought, Bayne & Co. were notoriously broken and dis-

credited, the defendant's alleged ignorance of any suspicious circumstances ought not to have relieved him ; if they should also have found that the exercise of reasonable diligence, on his part as a business man, would have made him acquainted with the actual fact of the failure.

*William A. Fisher* and *Charles Marshall,* for the appellee.

The appellee was not a *del credere* factor at all. *Story on Agency,* sec. 33. He occupied a different relation to the plaintiffs, and was merely a guarantor, receiving one commission under an agreement, under which he had induced Akers to become a buyer, and a further commission for guaranteeing that Akers would pay what he owed.

But even if the appellee could be treated as an ordinary *factor del credere,* the commission extends only to the guarantee of the payment of the money by the debtor, and he is but surety. *Parson's Mer. Law,* sec. 9, *ch.* 10, 15 ; *Story on Agency,* sec. 215 ; *Thompson vs. Perkins,* 3 *Mason,* 236 ; *Morris vs. Cleasby,* 4 *Maule & Selwyn,* 574 ; *Goodenow vs. Tyler,* 1 *Amer. Lead. Cases,* 668 ; *Heuback vs. Mollman,* 2 *Duer,* 227 ; *Muller vs. Bohlens,* 2 *Wash. C. C. Rep.,* 378 ; *Peele vs. Northcote,* 7 *Taunton,* 478.

The money received becomes the *property* of the principal, who could maintain an action for money had and received. *Thompson vs. Perkins,* 3 *Mason,* 236 ; *W. B. Man. Co. vs. Searle,* 15 *Pick.,* 225 ; *Pitts vs. Mower,* 18 *Maine,* 361.

Even a *factor del credere* does not guarantee the safe transmission of the fund, and, in this instance, Brehme merely bought the gold to carry out the arrangement between Akers and the plaintiffs, that Akers could pay Brehme in currency, and Brehme would buy gold for the plaintiffs. *Story on Agency,* secs. 112 *and* 215 ; *Muller vs. Bohlens,* 2 *Wash. C. C.,* 378 ; *Leverick vs. Meigs,* 1 *Cowen,* 645 ; *Sharp vs. Emmet,* 5 *Wharton,* 288, 299 ; *Parson's Mer. Law,* 159 ; *Goodenow vs. Tyler,* 1 *Amer. Leading Cases,* 668 ; *Gorman vs. Wheeler,* 10 *Gray,* 362.

As to the transmission of the funds, Brehme was merely an unpaid agent, who acted for the convenience of the plaintiffs, and was responsible only for good faith and ordinary diligence. There was some conflict in the testimony as to the time when the fact of the failure of Bayne & Co., became known, but it was all submitted to the jury. It is clear, however, that the condition of Bayne & Co., was unknown to Brehme or his clerk, Mr. Keidel, when the draft was taken, and, as Bayne & Co., were the bankers, through whom all the gold drafts had been previously remitted to the plaintiffs, the second prayer certainly went to the furthest limits of the responsibility of the appellee as to the transmission. *Burrill vs. Phillips,* 1 *Gall.,* 360.

The first prayer of the appellants sought to impose liability upon the defendant as *endorser* of the draft, upon demand and notice to him, coupled with the fact that he made demand on Bayne & Co., and procured the securing of the claim in his own name, under the deed of trust executed by Bayne & Co.

Brehme was not liable as endorser, as all the circumstances show that no such responsibility was intended. *Castrique vs. Battigieg,* 10 *E. F. Moore, Privy C.,* 94; *Sharp vs. Emmet,* 5 *Wharton,* 288; *Chitty on Bills,* 34.

If the case were to be governed by the rules applicable to bills of exchange, there would be no sufficient evidence of demand to charge the endorser. The protest was not produced, and the only evidence consisted in the proof that the note was PROTESTED in New York, *non constat,* that it was ever *presented* at all. *Peoples' Bank vs. Brooke,* 31 *Md.,* 7.

In the relation existing between the parties, it was eminently proper that Brehme should accept for the plaintiffs the benefit of a security given in his own name, and his doing so can have no bearing upon his responsibility to the plaintiffs. *Gorman vs. Wheeler,* 10 *Gray,* 362.

The second prayer of the appellants proceeded upon a supposed assumption of the loss by the appellee. There were no

facts to sustain the prayer as put, but even if Brehme had believed himself liable, and had so conceded and assumed the debt, he would not be liable under the circumstances of the case. *Wyman vs. Gray,* 7 *H. & J.,* 409; *Jones vs. Ashburnham,* 4 *East.,* 455.

ALVEY, J., delivered the opinion of the Court.

It is conceded in this case that the defendant was the agent of the plaintiffs for the sale of goods, and that, in addition to the commission allowed the defendant as ordinary agent, an additional commission was agreed to be allowed, and was actually allowed, for and in consideration of the defendant's guaranty of payment of all bills of goods purchased of the plaintiffs by a certain customer, who was, through the agency of the defendant, induced to deal with the plaintiffs, merchants in Philadelphia, and such additional commission was to be paid whether the purchases were made by the particular customer directly of the plaintiffs, or through the defendant as their agent. The customer having purchased goods of the plaintiffs, and paid for them to the defendant, the agent, and the money having been lost in the manner disclosed in the evidence and stated in the prayers of the respective parties, the question is, upon whom is that loss to fall.

It is insisted on the part of the plaintiffs that the defendant, being an agent, acting under a *del credere* commission, is bound to pay, not conditionally, but absolutely, as if he were himself the vendee of the goods; and that, consequently, he did not discharge his liability by the purchase and transmission of the gold draft of the 27th of April, 1866. And even if the liability of the defendant, by reason of the *del credere* commission, be not maintainable to the extent contended for, still, the plaintiffs insist that as ordinary agent, whose duty it was to remit funds to his principal, the defendant having procured the draft payable to his own order, and endorsed it to the plaintiffs without excluding recourse, is, under all the circumstances attending the transaction, liable

as endorser, the drawer having failed, and the draft meeting with dishonor.

On the other hand, the defendant contends that his relation to the plaintiffs was not that of a *del credere* agent or factor, strictly speaking; but that if he be so regarded the guaranty, in consideration of the commission, only extends to the payment of the money for the goods by the vendee, and not to its safe transmission to the vendor; and that, consequently, the guaranty was gratified and discharged when the money was paid by the purchaser to the defendant as the plaintiffs' agent. He also contends that he is not liable as endorser of the draft transmitted, because of the relation of principal and agent existing at the time between the plaintiffs and himself, in reference to which the draft was purchased, and that, acting for the convenience of the plaintiffs, he can only be held responsible for good faith and ordinary diligence.

These positions of the parties were sought to be maintained by them at the trial in the Court below, and with that view they propounded prayers for instruction to the jury; but the Court rejecting those of the plaintiffs, and granting those offered by the defendant, the plaintiffs have brought those rulings to this Court for review, and whether they be correct or otherwise, according to our judgment, will appear in the sequel of this opinion.

We cannot resist the conclusion that the defendant was, at the time of the transactions involved in this controversy, strictly a *del credere* agent of the plaintiffs; although the nature and extent of the obligation imposed upon such an agent has been variously stated, and, in regard to it, down even to the present time, no little conflict will be found to exist among Judges and authors of the highest repute. On the one hand there are those who maintain that an agent *del credere* for the sale of goods, makes himself absolutely and in the first instance liable to his principal for the price of the goods sold; while on the other hand it has been strongly maintained that such an agent only incurs a secondary res-

ponsibility, that of mere surety, whereby he can be required to pay only in the event of failure on the part of the principal debtor. And some of the authorities have gone to the extreme of maintaining that the undertaking of the agent under a *del credere* commission is a mere guaranty of the debt of another, and therefore within the Statute of Frauds. Which of these positions is correct depends, to a great extent, upon the state of the authorities, the question never having been finally adjudicated in this State.

Whenever an agent, in consideration of additional commission, such as was agreed to be allowed in this case, guarantees to his principal the payment of debts that become due through his agency, he is said to act under a *del credere* commission. What then is the nature and extent of this guaranty? In *Grove vs. Dubois*, 1 *T. Rep.*, 112, a case of a policy broker, Lord MANSFIELD answered this question in very plain and unqualified terms when he said, " It is an absolute engagement to the principal from the broker, and makes him liable in the first instance. There is no occasion for the principal to communicate with the underwriter, though the law allows the principal, *for his benefit*, to resort to him as collateral security. But the broker is liable at all events." In this Mr. Justice BULLER concurred, and said that he had known many actions to have been brought against brokers with commission *del credere*, and that he had never heard any inquiry made in such cases, whether there had been a previous demand upon the underwriter and refusal ; and he declared that such was not the practice. Thus showing, according to the opinions of these great Judges, that the obligation of such undertaking was primary and absolute in its character, and that the agent was regarded as standing in the relation to his principal of an original debtor.

Ten years after the case of *Grove vs. Dubois*, the case of *Mackenzie vs. Scott*, 6 *Bro. P. C.*, 280, occurred in the House of Lords, on an appeal from the Court of Sessions in Scotland. That case was very analogous in its circumstances to

the one before us. There, a factor under a commission *del credere*, sold goods and took accepted bills from the purchasers, which he endorsed to a banker at the place of sale, and received the banker's bill for the amount, payable to his, the factor's, own order, on a house in London. This banker's bill the factor endorsed and transmitted to his principal, who got the same accepted. The acceptors and drawer having failed before payment, it was held, according to the head note of the case, that the factor was answerable for the amount of the bill, being personally liable under his commission *del credere*, to satisfy his principal the price of the goods sold.

It was insisted in that case, as it has been in this, that the *del credere* obligation extended only to guaranteeing the payment of the price of the goods by the vendee, and that the remittance of the money by the factor was a transaction entirely different and distinct. But, if the uniform interpretation of that case be correct, (there being no reasons assigned for the judgment given,) the argument in that respect did not avail; and, in view of the law as it had been announced in *Grove vs. Dubois*, it is not difficult to perceive upon what ground that decision was based. And afterwards, in 1803, the same general proposition was again pointedly asserted as the law of England in the case of *Houghton vs. Matthews*, 3 *Bos. & Pull.*, 489.

By these decisions the law was regarded as settled in England, until about the year 1816; and all the text writers, and authors of elementary treatises upon the subject of commercial contracts before that time laid it down, as the unquestionable law, that an agent, acting under a commission *del credere*, was bound to his principal in the first instance and as an original debtor. The law will be found so stated by *Livermore, in his work on Agency*, 409, 410; by *Paley on Agency*, 40; by *Comyn on Contracts*, 1 *vol.*, 253; *and by Chitty in his work on Com. Law*, 3 *vol.*, 222.

But it is said that the cases to which we have referred do not now announce the law as accepted in England, and we

are referred to the case of *Morris vs. Cleasby*, 4 *Maul. & Selw.*, 566, decided in 1816, and the cases following on its authority, to show how the rule has been qualified if not entirely changed.

It is true, in the case of *Morris vs. Cleasby*, Lord ELLEN-BOROUGH did express a decided dissent from the principle announced in the previous decisions, both as to the nature and scope of the *del credere* obligation. He said that the guarantor, in consideration of the commission, is only to answer for the solvency of the vendee, and to pay the money if the vendee does not; and that, on the failure of the vendee, the agent is to stand in his place and make his default good. Thus clearly placing the agent in the position of mere surety to the purchaser of the goods. And if such be the true nature and character of the contract, seeing that it is entirely collateral and secondary, it is difficult to perceive how it can escape the operation of the Statute of Frauds. Be that, however, as it may, the decision of Lord ELLENBOROUGH was sanctioned by the case of *Peele vs. Northcote*, 7 *Taunt.*, 478, and also impliedly sanctioned by the case of *Gall vs. Comber*, 7 *Taunt.*, 558, in the Common Pleas. And from the time of these last decisions, until very recently, all the treatises on commercial contracts have stated the law in accordance with the opinion of Lord ELLENBOROUGH, taking the doctrine of Lord MANSFIELD to have been overruled. It is so stated in *Chitty on Contracts*; *Russell on the Law relating to Factors and Brokers*; *Smith's Commercial Law*, and in other works treating of the subject.

Nor has there been uniformity of decision on the subject in the Courts of this country; though we think the decided weight of authority is in support of the doctrine as announced in *Grove vs. Dubois*. In the case of *Thompson vs. Perkins*, 3 *Mason C. C. Rep.*, 232, before Judge STORY, in 1823, the principle of *Grove vs. Dubois* was repudiated as being incorrect, and that of *Morris vs. Cleasby* sanctioned; though the facts of the case do not appear to have required a distinct ruling upon the particular question now presented. It was

an action of *assumpsit* by the principal against the assignee of the factor *del credere* who had sold the goods of his principal, and taken negotiable notes payable on time, in his own name, for the amount of sales; and afterwards, and before the notes became due, the factor failed, and assigned the notes to his assignee, for the benefit of his creditors, and the assignee afterwards receiving the money due on the notes, it was held that the principal was entitled to recover the money so received from the assignee, subject to a deduction of the amount of the lien of the factor for his commissions and charges. Upon such state of facts, it is clear, the right to recover was equally the result of the doctrine of Lord MANSFIELD as that of Lord ELLENBOROUGH. All the cases concede it to be the right of the principal to forbid payment to the agent, and to maintain an action himself against the buyer to recover the price of the goods; or to pursue his goods, or the notes taken for them, into the hands of third parties precisely as if no *del credere* contract existed. And though such right in the principal would seem to consist only with a collateral undertaking by the agent, yet, in the contract *del credere,* being *sui generis,* it is held in no wise to change the original and independent character of the agent's undertaking to his principal.

In the case of *Swan vs. Nesmith,* 7 *Pick.,* 220, occurring a few years after the case in 3 *Mason,* the Supreme Court of Massachusetts decided that the legal effect of a commission *del credere* was to make the agent liable at all events for the proceeds of the sale, so that he might be charged in *indebitatus assumpsit,* as for goods sold to him. There the contract was admitted to be original and not collateral, and therefore not within the Statute of Frauds; and the necessary conclusion is, that the Court intended fully to sanction the principle of *Grove vs. Dubois,* to which, and the case of *Mackenzie vs. Scott,* they refer for the definition of the nature of the commission *del credere.* And so in New York, the same principle is established, as will be seen by reference to *Wolf vs. Koppel,* 5 *Hill,* 458, and same case on appeal, 2 *Denio,* 368,

and *Sherwood vs. Stone*, 14 *N. Y.*, 267. The two last cases, being in the Court of last resort, fully approve and adopt, as far as we can discover from the opinions delivered, the principle of the cases of *Grove vs. Dubois* and *Mackenzie vs. Scott*. Judge STORY, however, in his work on *Agency,* section 215, adopting his own view of the law as found in *Thompson vs. Perkins*, supported by *Morris vs. Cleasby*, and the cases in the Common Pleas, says that the true engagement of the agent *del credere* is merely to pay the debt, if it is not punctually discharged by the buyer. That, in legal effect, he warrants or guaranties the debt; and thus he stands more in the character of a surety for the debt, than as debtor. And the principle is so stated in other American treatises. But, with all due deference to the high authority of Judge STORY, we think the decided weight of authority is against his position.

In England the question has been recently under discussion and re-examination, and the result of which is quite at variance with the doctrine laid down in *Morris vs. Cleasby*. In *Couturier vs. Hastie*, 8 *Exch.*, 39, the action was brought by the principal against his factor who, on commission *del credere*, had sold a cargo of corn, and the purchaser refusing to comply with the contract on insufficient grounds, and afterwards becoming bankrupt, the question was whether the factor was liable for the non-fulfilment of the contract, by reason of his *del credere* commission, there being no guarantee in writing; and the Court held the factor liable, not regarding the undertaking as one simply to pay the debt of another, within the 4th section of the Statute of Frauds; and the decision in *Wolf vs. Koppel*, 5 *Hill*, 458, was referred to and adopted as containing sound law upon the subject. And in the more recent case of *Wickham vs. Wickham*, 2 *Kay & John.*, 478, Sir WM. PAGE WOOD, then the Vice-Chancellor, and at present the Lord CHANCELLOR, of England, in referring to the case of *Couturier vs. Hastie*, as authority, said: "When I look at the whole of that case, and consider the

reasons given by the Judges in delivering their judgments, though given very cautiously and guardedly, I cannot but conclude that they considered that an agent entering into a contract in the nature of a *del credere* agency, entered in effect into a new substantial agreement with. the persons whose agency he undertook; that the agreement so entered into by him was not a simple guarantee, *but a distinct and positive undertaking on his part, on which he would become primarily liable:* Otherwise, I cannot see how the learned Judges could arrive at the conclusion that the undertaking was not within the Statute of Frauds."

Supposing this to be the correct conclusion deducible from the present state of the authorities, of which we have no doubt, the contract being distinct and positive, rendering the agent primarily liable, it necessarily follows that the agent stands in no such relation to his principal as that of mere surety for the price of the goods sold. His relation to his principal is that of debtor as well as agent; and being so, the legal consequences of the debtor relation must follow. Indeed, it was conceded in the case of *Leverick vs. Meigs,* 1 *Cow.,* 645, where the liability of such an agent was attempted to be restricted, that if by the engagement the agent became a debtor absolutely, as if he were himself the purchaser, he would be bound for the remittance of the money, as well as for its payment by the buyer. " This arises from the general principle, that the debtor is bound to make payment to his creditor, and consequently, if he remits a bill which turns out of no avail, it is no payment. It does not discharge a precedent debt, unless it be so expressly agreed between the parties;" (1 *Salk.,* 124; 2 *John. Cas.,* 441; *Glenn vs. Smith,* 2 *Gill & John.,* 493;) or, unless the creditor parts with the bill, or is guilty of *laches,* to the prejudice of the debtor, in not presenting it for acceptance or payment in due time.

Of course, the agent, acting under a commission *del credere,* where the goods have been sold on an authorized credit, cannot be required to account to his principal before the expira-

tion of the credit given to the buyer. And if the money which comes into his hands be remitted under special instruction from the principal, then it will be at the risk of the latter, provided the instructions are observed with proper caution and diligence on the part of the agent. But in this case, it is not pretended that there were any special instructions in regard to the manner of remitting the money received by the defendant. The remittance therefore was at his risk, as it would be of any other debtor remitting funds to discharge a debt due by him.

Such being our view in regard to the liability of the defendant as an agent acting under a commission *del credere*, we are of opinion that there was error committed by the Court below in refusing to grant the first prayer of the plaintiffs, which was intended to present the case as within the principle of *Grove vs. Dubois* and *Mackenzie vs. Scott*, and particularly the latter, to which this case bears a strong analogy.

But as it has been earnestly contended in argument that the contract *del credere* only extends to the payment of the price of the goods, and not to the remittance of the money to the principal, and the Court below having so instructed the jury, let us examine the case briefly upon that supposition, in order to determine whether the defendant be not liable as indorser of the gold draft transmitted to the plaintiffs.

The defendant upon collecting the amount due from Akers, placed the money in his own account with his bankers, and purchased of them the gold draft that was afterwards dishonored, by a check on his account. This draft he caused to be made payable to his own order, without reference to his character as agent, and after indorsing it to the plaintiffs, or their order, it was transmitted to them to pay not only the price of the goods sold to Akers, but a balance due from the defendant himself. The draft proving worthless, and having been purchased without special directions, what is the liability of the defendant by reason of his unqualified indorsement?

Judge STORY, in his work on *Agency, sec.* 157, states the rule as an unqualified one, that an agent, though known as such, who indorses a bill or note generally, makes himself personally responsible; " for, in such a case, although he is a known agent, the making, or accepting, or indorsing of the instrument, is treated as an admission that it is his personal act, not only in respect to third persons, but also in respect to his principal." And for this proposition, as stated, he cites many respectable authorities.    So CHITTY in his work on *Bills, on page* 46, states the same general principle, and says, " if a person employed by the plaintiff to purchase bills for him, obtain them payable to himself, and indorses them generally, he will be liable upon that indorsement, 'even to his own employer, although he had no guarantee commission; " and the Court, in deciding one of the cases referred to, observed that the defendant might have specially indorsed the bill *sans recours,* and not having thought fit to do so, he was personally liable.    And for other authorities supporting the same general proposition, see *Smith on Mercantile Law,* 164; *Russ. on Brokers and Factors,* 263, 264; *Parsons on Notes and Bills,* 102.

Notwithstanding, however, the rule is thus generally and unqualifiedly stated, we think, on the more recent authorities, it is not to be applied, as between the principal and agent themselves, without some limitation.    The indorsment, of course, if unqualified, is to be taken as importing *prima facie* liability on the part of the agent.    He should be allowed to show, however, as matter of defence, that it was not the intention that he should be personally charged by his indorsement; and if there be no intention to create personal liability, none will exist as between himself and his principal.    Whether such intention exists will, in all cases, depend upon the circumstances of the transaction.    But, as was said by Mr. Chief Justice TILGHMAN, in *Miles vs. O'Hara,* 1 *Sergt. & Rawle,* 32, the circumstances should be *clear* and *strong* to take off the presumption which arises

from the indorsement. See the case of *Castrique vs. Batti-gieg,* 10 *E. F. Moore,* 94, before the Privy Council.

Such being the law, the next question is, has the liability of the defendant been fixed by the proper evidence of due demand and notice?

No direct proof of demand and notice was offered at the trial. In the absence of such evidence, the liability was sought to be fixed by reason of the conduct and declarations of the defendant subsequent to the protest of the draft. The plaintiffs' second prayer enumerates the facts that were supposed to have fixed the defendant's responsibility as indorser; and whether they are sufficient for that purpose is the question to be decided.

If, in point of fact, there had been no demand and notice of dishonor, or insufficient demand and notice, we think this second prayer defective, because it does not submit to the jury to find whether the defendant was fully informed, at the time of the promise and other conduct relied on, of all the facts and circumstances of the neglect to make demand and to give the notice. The promise and other circumstances stated in this prayer would certainly be sufficient to charge the defendant as indorser, if he possessed full knowledge at the time. Without such knowledge, however, his promise or acknowledgment would not bind him. It is, therefore, essential, in this aspect of the case, that the fact of knowledge be found by the jury, in addition to the fact of the defendant's treating the debt as his own and promising to pay it to the plaintiffs. *Beck vs. Thompson,* 4 *H. & J.,* 531; 1 *Parsons on Notes and Bills,* 595, and the authorities there cited.

But if the party is sought to be charged on his indorsement, and his promise or assumption be used as evidence of the previous demand and notice, a different principle applies. In such case, any promise to pay, or admission made by the indorser that he continues liable, subsequent to the dishonor, is good evidence upon which to found a presumption that every thing has been properly done to render him liable.

This is a principle now well established. As in the case of *Lundie vs. Robertson*, 7 *East*, 231, which was an action by an indorsee against an indorser, and the only evidence of notice of dishonor being the promise of the defendant, Lord ELLENBOROUGH said: " When a man against whom there is a demand promises to pay it, for the necessary facilitating of business between man and man, every thing must be presumed against him. It was therefore to be presumed *prima facie* from the promise so made, that the bill had been presented for payment in due time and dishonored, and that due notice had been given of it to the defendant." And so in the case of *Hicks vs. Beaufort*, 4 *Bing. N. C.*, 229, where the question was similar to that in *Lundie vs. Robertson*, TINDALL, C. J., said: " The cases go on this point only; that if, after the dishonor of a bill, the drawer distinctly promises to pay, that is evidence from which it may be inferred he has received notice of the dishonor, because men are not prone to make admissions against themselves; and therefore when the drawer promises to pay, it is to be presumed he does so because the acceptor has refused."

This presumption, however, is one of fact for the jury, and not an absolute legal conclusion to be drawn by the Court. It is *prima facia* only, and liable to be rebutted. 4 *Bing. N. C.*, 229; *Booth vs. Jacobs*, 3 *Nev. & Man.*, 351; *Picken vs. Graham*, 1 *Cr. & Mee.*, 728; *Brownwell vs. Bonney*, 1 *Q. B.*, 39. If no demand had been made and notice given, the defendant would be entitled to prove the omission, and the further fact that his promise or acknowledgement had been made without knowledge of the plaintiffs' neglect in this respect, and thus rebut the presumption. The jury should be required to find from the evidence whether due demand and notice had occurred, as ground of the plaintiffs' right to recover. This being so, the plaintiffs' second prayer is also erroneous in not requiring due demand and notice to be found by the jury. Instead of making the right of recovery depend upon the legal conclusion to be drawn from the facts stated,

the jury should have been instructed that it was competent to them, from the facts enumerated, if found to exist, to infer and conclude, as matter of fact, that due demand had been made and notice of dishonor given, and if they should so find, that then the plaintiffs were entitled to recover. It follows, therefore, that the plaintiffs' second prayer was properly rejected by the Court below.

It results necessarily from what has been said that the defendant's first prayer was erroneous, and should not have been granted. It assumed that the contract resulting from the *del credere* commission was discharged in the payment of the money by Akers to the defendant. This, as we have seen, was an erroneous view of the law. It also follows from what we have said in reference to the plaintiffs' second prayer, that the second prayer of the defendant should not have been granted. It assumed that the defendant could not be held liable, after the receipt of the money from Akers, either by virtue of the commission *del credere*, or his indorsement of the draft, if he used ordinary diligence in transmitting the money to the plaintiffs. This, as we have shewn, is not maintainable. The judgment below will be reversed, and a new trial awarded.

> *Judgment reversed,*
> *and new trial awarded.*

(Decided 12th January, 1871.)