## BRISTOL COUNTY.

### JOHN C. BALDERSTON *et al. vs.* THE NATIONAL RUBBER COMPANY *et al.*

A factor under a *del credere* commission and an agreement by which he was to make monthly advances up to eighty per cent. of the market value of the goods consigned for sale, received goods from his principal and made the advances agreed on. The principal became insolvent and made an assignment for the benefit of his creditors.

*Held*, that the factor was not entitled to claim from the assignee a dividend on the whole amount of the advances made and at the time of the assignment remaining unpaid from the proceeds of sales, but only on the balance to be found due after crediting the net proceeds from the sales when made of the goods on hand at the date of the assignment.

A factor must enforce his lien for advances against the property in his hands before claiming payment from his principal, the consignor of the property.

A factor, under a *del credere* commission is liable to the consignor as a principal debtor, and if the sale debt is not paid when due is subject for the amount of the sale to an *indebitatus assumpsit*.

BILL IN EQUITY to establish the complainants' right to a dividend from the respondents' assignees and for an account.

*July* 1, 1893. TILLINGHAST, J. By agreement of the parties, this case is submitted to the court, on the following questions of law, viz.:

" *First*. Whether under the agreement between the com-

plainants and the respondent corporation, annexed to the bill as Exhibit A, the complainants are or not entitled to receive from the assignee of the National Rubber Company a dividend upon the whole amount of the advances made by them to said Rubber Company and unpaid from the proceeds of goods sold at the time of the company's assignment, or only on the balance, if any, that might thereafter be found to be due after crediting the proceeds when sold of the goods on hand at the date of the assignment of said Rubber Company.

" *Second.* Whether or not the failure of the complainant, John C. Balderston, to include said advances from said complainants as an indebtedness of said Rubber Company in the returns made by said company under the manufacturing corporations law of the State of Rhode Island and signed by him as president and director of said company, estops said complainants from making any claim for advances as a then present indebtedness from said company to said complainants in light of the following:

"In the answer of the respondent it is alleged that said John C. Balderston, one of the complainants, was a director of the National Rubber Company, and as such director signed annual returns of said Company's affairs, as required under the provisions of the manufacturing corporations act, so called, Pub. Stat. R. I. cap. 155, which returns as alleged in said answer did not include in the statement of the Company's indebtedness said advances of the complainants made under their said agreement, and the respondents claim that said failure to set forth said advances in said returns as indebtedness of said Rubber Company estops said complainants from making any claim for said advances as a then present indebtedness from said Rubber Company to said complainants.

"The complainants now assert in the way of explanation of said returns that the method pursued by said Rubber Company in making calculation for the same was as follows: that the officers of the Rubber Company deducted from the amount of merchandise in the hands of the complainants the amount

of said advances thereon, and treated the balance with other personal estate of the Rubber Company as the aggregate amount of its personal assets, the complainants further asserting and the defendants for the purpose of this hearing admitting that mode to be the usual mode pursued by the officers of said Company and the mode usually pursued by corporations in said State of Rhode Island.

" Said allegations of the respondents in the answer as to said returns, however made up, are not deemed material by the complainants, and it is understood that said allegations as set forth in said answer, and said assertions and explanations made by said complainants, as hereinabove set forth, are admitted by the parties hereto only for the purpose of this hearing and for no other purpose and without prejudice to proving to the contrary in the later stages of this case if material.

" And all further questions, including the state of accounts between parties, shall be reserved until the above questions of law have been heard and determined."

The agreement above referred to is as follows:

"Memorandum of an agreement between the National Rubber Co., and Balderston & Daggett, made this second day of April, A. D., eighteen hundred and eighty-four.

" *First.* The National Rubber Company are to consign all their production of boots and shoes to Balderston & Daggett for sale and returns, with the following exceptions: 1. Said National Rubber Co. are to have the liberty to sell or consign goods to foreign countries except to the British provinces of North America. 2. They are to have the liberty to retail boots and shoes from their factory at Bristol.

" *Second.* The National Rubber Co. are to pay Balderston & Daggett five per cent. upon the net amount of their sales as a commission and guaranty, and also interest upon any sums which they may owe them, at the rate of six per cent. per annum, or such other rate as may from time to time in writing be agreed upon to be a fair rate, taking the market value of money into consideration.

"*Third.* The National Rubber Co. agree to deliver the goods

at the warehouse of Balderston & Daggett in Boston or in New York (if it is agreed that a branch shall be established there), free of expense to Balderston & Daggett.

"*Fourth.* Balderston & Daggett agree to receive on consignment the production of the National Rubber Co. in boots and shoes as contemplated in the first article, and to use their best exertion to sell the same to the best advantage and to account to the National Rubber Co. for the same at the price that they shall obtain for them, and to charge as commission and guaranty five per cent., and from time to time to advise what kinds and styles of goods are necessary to be made in order to have the stock well assorted.

"*Fifth.* Balderston & Daggett agree to advance to the National Rubber Co. at least fifty thousand dollars per month, upon the basis of eighty per cent. of the market value of the boots and shoes consigned by them to Balderston & Daggett at the rate of interest hereinbefore named.

"*Sixth.* It is understood that such goods as are usually sold as clothing and placed on the clothing list, as for instance lumbermen's pants with boots, and 'Baptismal pants,' are not consigned exclusively to Balderston & Daggett.

"*Seventh.* This agreement is to continue in force for the term of five years from the first day of April, 1884, unless sooner terminated by the dissolution of the firm of Balderston & Daggett, or by the long continued incapability of both of said general partners to attend to the business thereof. It is also provided that this contract shall terminate on the first day of April or first day of October, whichever shall first occur next after the death of either general partner in said firm, whether said firm be then dissolved or not.

"*Eighth.* The prices, for which the boots and shoes consigned to Balderston & Daggett by the National Rubber Co., are to be sold, are to be fixed by the National Rubber Co. from time to time, upon consultation with Balderston & Daggett, and having due regard to the prices at which other leading manufacturers are selling their boots and shoes of equal quality.

"In witness whereof the parties hereto have set their hands

and affixed their seals the day and year first herein mentioned.

NATIONAL RUBBER CO.,         [L. S.]

By Thos. G. Carson,   ⎫  *A Committee appointed*
A. O. Bourn,          ⎬  *for the purpose of making*
Nahum Chapin,         ⎭  *this agreement.*

BALDERSTON & DAGGETT.    [L. S.]"

The first question which logically presents itself for our consideration under the stipulation of the parties to the suit is this, viz.: What was the legal effect of the memorandum agreement above recited? In order to intelligently determine this question it will be useful to inquire, *first*, what sort of an agreement it was; *second*, what were the objects sought to be accomplished thereby, and *third*, what were the respective rights of the parties thereunder.

*First*, then, what sort of an agreement was it?

It was an agreement to sell goods for the defendant corporation, under a *del credere* commission.

*Second.* What were the objects sought to be accomplished thereby?

On the part of the defendant corporation they evidently were, 1, to secure a reliable market for its goods, and 2, to provide for a definite and steady income therefrom by way of advances thereon, to enable it to successfully carry on its operations and meet its current expenses; while on the part of the plaintiffs the object evidently was to secure the control and sale of the defendant's product, and thereby obtain the commissions agreed upon.

*Third.* What were the respective rights of the parties thereunder? The plaintiffs were entitled on the one hand, 1, to have consigned to them, the entire product of said corporation, with certain specified exceptions, with the right to sell and dispose of the same at the prices to be fixed from time to time by the said corporation upon consultation with the plaintiffs, and to receive therefor a commission of five per cent. on the net amount of such sales; and 2, to receive interest on any sums which the said corporation might owe

them, at the rate of six per cent. per annum, or such other rate as might from time to time be agreed upon.

The said corporation, on the other hand, was entitled to receive from the plaintiffs, by way of advances, at least $50,000 per month, upon the basis of eighty per cent. of the market value of the boots and shoes consigned, to fix the prices at which the same should be sold, upon consultation as aforesaid, and to hold said plaintiffs personally liable for all goods sold by them.   The relations which the parties sustained to each other under this agreement, were those of principal and factor, and the law applicable to such relations must therefore control in the interpretation thereof.   As to the general rules which obtain, and the general rights of the parties which arise under an agreement of this sort, there is but little divergence of judicial authority, said rules and rights, from the great importance of the subject matter involved, having long since become firmly imbedded in the commercial law of the land.   But as to particular rights and obligations growing out of the relations aforesaid and notably, as to the rights of the factor regarding advances made by him, the authorities are not entirely harmonious, one line of cases holding substantially, that an advance creates a debt *eo instanti,* on the part of the consignor, as for so much money lent to him at his request, while another line holds that an advance does not create a debt in the first instance, it being the duty of the factor to first look to the goods consigned for his advancements and commissions and if they are insufficient, that then he may have recourse to the consignor to make up the deficiency.   In short the authorities are at issue upon the simple question as to whether the factor *may* enforce his lien for advances, &c., against the property in his hands before looking to the consignor therefor, or whether he *must* enforce it, before so doing.   Amongst the cases which maintain the former doctrine are *Beckwith* v. *Sibley,* 11 Pick. 482; *Upham et al.* v. *Lefavour,* 11 Metc. 174; *Dolan* v. *Thompson,* 126 Mass. 183; *Burrill* v. *Phillips,* 1 Gall. 360; *Peisch* v. *Dickson,* 1 Mason, 9; *Mertens* v. *Nottebohms,* 4 Gratt. 163; while amongst those which maintain the latter, are *Gihon* v.

*Stanton,* 9 N. Y. 476; *Hoy* v. *Reade,* 1 Sweeny, N. Y. 626; *Corlies* v. *Cumming,* 6 Cow. 181; *Frothingham* v. *Everton,* 12 N. H. 239; *Kraft* v. *Fancher & Brown,* 44 Md. 204.    See also Edwards on Bailments, § 366; Edwards on Factors and Brokers, §§ 18, 86, and cases cited.    We are strongly inclined to the opinion that the better reason, if not indeed, the weight of authority, is with the last named cases.    It is not reasonable to suppose that the parties to the agreement before us contemplated that the advances made in pursuance thereof, should constitute a present indebtedness on the part of the consignors, for which an action might at once be maintained.    What are "advances"?    They are moneys paid by the factor to his principal, on the credit of the goods consigned, and in anticipation of the debt which will become due to the principal, upon the sale of such goods.    The ordinary use of the term, indicates moneys paid before, or in advance of, the proper time of payment.    To "advance" is to "supply beforehand," "to loan before the work is done or the goods are made."    *Powder Co.* v. *Burkhardt,* 97 U. S. 110.    As well stated in *Gihon* v. *Stanton, supra,* "An advance is something which precedes; and of course there is something to follow.    As applied to the payment of money, the term implies that the parties look forward to a time when the money will be due to the recipient.    A debtor who voluntarily pays his debt before it is due is said to advance it.    Can he recover it back?    An advance by a factor is a transaction somewhat similar.    It is a prepayment; a mere anticipation of the avails of the goods consigned; and no more creates a debt in the first instance, than an advancement of a father to his son, in anticipation of his expected inheritance, creates a debt.    It is true, that if the property proves insufficient to reimburse the factor for his advances, the law, in the absence of any agreement to the contrary, implies an undertaking to make up the deficiency."    In *Hoy* v. *Reade, supra,* the court in speaking of an advance said: "It is in fact a prepayment on account of a debt anticipated by both parties to arise to that or a greater amount from the consignor to the consignee, out of the performance by the consignee of a

contract existing between them. It necessarily results that before the consignee can call on the consignor to pay back any portion of this prepayment he must show the performance of this contract, and that his indebtedness arising thereout did not, as was anticipated, amount to the prepayment." That the law as thus stated is well founded in reason, and indeed, well nigh indispensible to the successful prosecution of manufacturing and commercial enterprises, is evident from the results which might follow from the adoption of the rule contended for by the plaintiffs. · For, if an advance by a factor has the effect of creating a present indebtedness against the consignor, the latter is liable at any moment to be called upon to repay the amount advanced, and, failing so to do, to render his property liable to be attached, and his whole business stopped, if not destroyed, while at the same time, the goods which have been probably produced in part by virtue of the advances, are in the hands of the factor, and presumably, entirely sufficient to compensate him for all his advances. Take the case in hand. The plaintiffs agreed to advance $50,000 per month upon the basis of eighty per cent. of the market value of the boots and shoes consigned to them. Before they could be called upon to make the first advance of said sum, the defendant corporation must have placed in their hands and possession goods of the value of $62,500. The plaintiffs, on the one hand, by such transaction took a vested interest in all of said goods to the amount of $50,000, while the defendant corporation on the other received $50,000, practically by way of prepayment thereon. Now is there any sense or justice in saying that, notwithstanding the fact that the plaintiffs were thus secured for said advance, they could immediately turn around and sue the defendant corporation therefor? We think not. For, as stated in the defendant's brief: " To treat such advances as a present debt which could be recovered back immediately would be an absurdity, for the anomalous condition would then be presented that, while the factor could sue for the advances and recover them back, he would thereby at once render himself liable under his contract for the advances therein agreed to

be made in the proportion indicated. If he were in advance, he could sue for such advances; if he recovered them back, he could be sued for not being in advance." But, even resting the case solely on the manifest construction of the agreement, the plaintiffs have no claim to recover their advances; and for the simple reason that in the making thereof, they only fulfilled their part of the contract in this respect. And now to allow them to recover for said advances, before performing the remainder of said contract devolved upon them, viz.: to sell said goods, would be to permit them to undo what, under said contract they not only did, but were legally bound to do.

Again, the plaintiffs were selling said goods under a *del credere* commission. And, while the nature and extent of a factor's obligation under such a commission, have been much disputed, the later English, together with some American authorities, holding that he is liable as a surety merely, yet the decided preponderance of authority in the United States is to the effect that one who sells under such a commission, "is liable absolutely, as a principal, and that if the debt be not paid when due, *indebitatus assumpsit* will lie against him at once for the amount." Meecham on Agency, § 1014 and cases cited in note 1; *Wolf* v: *Koppel*, 2 Denio, 368, 370; *Lewis Brothers & Co.* v. *Brehme*, 33 Md. 426–433. In a note to § 278 of Edwards on Bailments, the law is thus clearly stated: "The effect of a commission *del credere* is, in several particulars, to place the factor in new relation as to his principal. It is true, he is the debtor, but the principal still retains the right, at any time before payment, to resort to the purchaser as collateral security. It is a rule for the protection of the principal. A general factor may wait to receive instructions as to the mode of remitting the net proceeds, and is not liable to an action until a default, on his part, in remitting or paying the proceeds according to the orders of his principal: *Ferris* v. *Paris*, 10 Johns. Rep. 285. The only difference between a factor, acting under a *del credere* commission, or without one, is as to the sales made. In the former case he is absolutely liable, and may

correctly be said to become the debtor of his principal; but it is not strictly correct to say that he is placed in the same situation, as if he had become the purchaser himself; for, as we have seen, the principal, notwithstanding this liability, may exercise a control not allowable between creditor and debtor. When the principal appears, the right of the factor to receive payment ceases. The effect of the commission is not to extinguish the relation between principal and factor, but applies solely to a guaranty that the purchaser shall pay. The liability is not contingent, so as to require legal measures to be exhausted against the purchaser, before the factor is bound, but an engagement to pay on the day the purchase money becomes due. Although the factor is absolutely liable he is not bound to pay until the money becomes due from the purchaser. Subject to the limitations above mentioned, the factor, under a commission, becomes a debtor to his principal." This being the law, and the plaintiffs, having continued to sell and dispose of the goods in question, in the same manner since, as before the failure of the defendant corporation, they certainly would have no cause of action in any event, except for the balance that, upon an accounting, should now be found due to them.

But the plaintiffs argue that said agreement shows that the advances were to be treated as indebtedness, as appears by the second, fifth and eighth clauses thereof. The second clause speaks of sums which the consignors may "owe" the plaintiffs, and provides that interest shall be computed thereon; the fifth clause obligates the plaintiffs to make certain fixed advances, and the eighth clause allows the consignors to fix the prices of the goods to be sold. It is doubtless true, that in a certain qualified sense, the consignors would "owe" the plaintiffs for the advances which they should make under said contract, and for the simple reason that said advances, as already stated, were payments made in anticipation of a debt not due at the time. And as the consignors were to be accommodated in this way, it was natural that they should treat an advance as a temporary indebtedness so far as to call for the payment of interest

thereon. This was no more, in effect, than the making of a discount for money paid before it was due; a thing which is of every day occurrence in commercial transactions. As to the fifth and eighth clauses, we fail to discover wherein they indicate an intention to create a debt, except as aforesaid. Under the former the plaintiffs were to make certain fixed advances; but as already said, these were mere prepayments on account of goods received, while as to the latter, it simply shows that the consignors treated said goods as belonging to them, which they undoubtedly did, subject to the plaintiffs' lien thereon. That is, the consignors retained the general ownership of said goods until sold, with the right to fix the prices at which they should be sold. But this in no wise militates against the claim of the consignors that said advances did not create a present unqualified indebtedness. Moreover, we may add, that so far as we are aware, the custom and understanding amongst merchants and factors in this State, are in harmony with the views which we have herein expressed regarding advances.

It is clear, therefore, that in no event can the plaintiffs claim a dividend from the assignee upon the whole amount of the advances made by them and unpaid from the proceeds of goods sold at the time of said assignment.

But as before intimated, we think the better doctrine is, that where advances are made upon the faith of the goods consigned, and especially under an agreement like the one before us, the proceeds are to be deemed as the primary fund to which the factor must look for reimbursement, and that it must be made to appear that this fund is insufficient before he can recover his advances from the consignor.

From what has thus been said it will be apparent that the relations of the parties to this suit are radically different from those which existed in *Allen* v. *Danielson,* 15 R. I. 480, which is relied on by the plaintiffs, and hence that said case does not control the present one. In that case the question was, whether the creditors whose claims were secured by mortgage, were entitled to dividends on their full claims *pro ratâ* with the other creditors. The court held that they were,

on the ground that the creditors were severally creditors to the full amount of their claims, the security being regarded as something collateral, which did not reduce the debt. In the present case, however, as already intimated, the security was the primary fund to which the plaintiffs must look, and hence they held no claim except a contingent one against said corporation, and in no event to a greater amount than the balance, if any, that should be found due after exhausting their security. In other words, the plaintiffs were not entitled to double security in the first instance, as were the plaintiffs in the case cited, nor did they have any claim on which a suit could be based at the time of the assignment, or which they could prove, independently of the goods consigned to them and then on hand and unsold. The security which they held not only reduced the debt so far, indeed, as it was such, but if sufficient, entirely cancelled it. We therefore decide that the plaintiffs are not entitled to receive from the assignee of the defendant corporation a dividend upon the whole amount of the advances made by them and unpaid from the proceeds of goods sold, at the time of said assignment, but only on the balance, if any, that shall be found to be due after crediting the net proceeds when sold, of the goods on hand at the date of said assignment.

This conclusion renders it unnecessary for us to consider the second question submitted to us.

*Joseph C. Ely*, for complainants.

*Francis Colwell, Walter H. Barney & Samuel Norris, Jun.*, for respondents.